PEOPLE v WHITE

Opinion of the Court

1. Searches and Seizures—Police—Privacy—Search Warrant.
   Whenever the police intrude into a sphere of protected privacy without the prior authorization of a warrant issued by a neutral judicial officer, their conduct is subject to careful scrutiny by the courts.

2. Searches and Seizures—Burden of Proof—Probable Cause—Evidence—Admissibility.
   To sustain the validity of a warrantless search the burden rests on the people to demonstrate that the police acted in a reasonable manner, based on probable cause and in response to an exigent circumstance bringing the search under one of the specifically established exceptions to the warrant requirement; if the people fail to meet this burden it is the duty of Michigan's courts to suppress the admission into evidence of any fruits of the unwarranted search.

3. Criminal Law—Burden of Proof—Probable Cause—Police—Appeal and Error—Inferences.
   Since the people carry the burden of proving probable cause for

References for Points in Headnotes

[1, 2] 68 Am Jur 2d, Searches and Seizures §§ 35, 36.

[2, 3, 12] 68 Am Jur 2d, Searches and Seizures §§ 41–45.

[4, 10] 68 Am Jur 2d, Searches and Seizures § 35 *et seq.*

[5, 9, 11, 13] 29 Am Jur 2d, Evidence §§ 415, 531.

68 Am Jur 2d, Searches and Seizures §§ 43–45, 96, 99.

Validity, under Federal Constitution, of warrantless search of automobile—Supreme Court cases. 26 L Ed 2d 893.

Federal Constitution as affecting admissibility of evidence obtained by illegal search and seizure. 80 ALR2d 959.

Modern status of rule governing admissibility of evidence obtained by unlawful search and seizure. 50 ALR2d 531.

[6–8] 21 Am Jur 2d, Criminal Law §§ 368, 454, 456

[7] 21 Am Jur 2d, Criminal Law § 484 *et seq.*

29 Am Jur 2d, Evidence § 523 *et seq.*

Court's duty to advise or admonish accused as to consequences of plea of guilty, or to determine that he is advised thereof. 97 ALR2d 549.

police actions, the Michigan Supreme Court must accept the inference from the record that is most favorable to defendant.

4. SEARCHES AND SEIZURES—SEARCH WARRANT—POLICE.

The judicial preference for searches conducted under the authority of a search warrant should be expressed not only in terms of the narrowly drawn exceptions to the warrant requirement but also in terms of a more stringent standard of review applied to all aspects of warrantless searches; the courts thereby encourage police officers to seek a warrant before acting.

5. SEARCHES AND SEIZURES—POLICE—SEARCH WARRANT—AUTOMOBILES—WEAPONS—CONSTITUTIONAL LAW—EVIDENCE—MOTION TO SUPPRESS—APPEAL AND ERROR.

Search of an automobile and seizure of a gun violated the protection of the Federal and state Constitutions and the decision of the trial court denying defendant's motion to suppress the introduction of the gun as evidence was erroneous because the police proceeded to conduct a warrantless search in a situation that did not present an exigent circumstance and on the basis of questionably reliable information where defendant's automobile was parked and unoccupied when the police arrived with an ample number of officers to allow the automobile to be guarded while a warrant was sought, the police acted solely on the information supplied by an informant although there was no prior contact between the police officers and the informant that would have allowed them to assess his reliability, there was no indication that the police officers had available or knew of sufficient facts to corroborate the details of the informant's statement prior to their arrest and search, and the informant did not fit into the category of either a police officer, victim or uninvolved eyewitness that would allow the police, without more, to credit his reliability (US Const, Ams IV, XIV; Const 1963, art 1, § 11).

6. CRIMINAL LAW—APPEAL AND ERROR—STATEMENTS—ADMISSIBILITY—STATUTES—ARREST—ARRAIGNMENT—MAGISTRATE.

Michigan Supreme Court, in a pre-*Miranda v Arizona,* 384 US 436 (1966) situation, first examines the admissibility of statements of a defendant charged with a crime under the Michigan statutory requirements governing the arrest-arraignment process which provide that after a defendant has been arrested on felony charges he shall be taken before a magistrate for arraignment without unnecessary delay; only when the delay has been employed as a tool to extract a statement has an exclusionary rule been imposed under these sections (MCLA 764.13, 764.26).

7. CRIMINAL LAW—STATEMENTS—ADMISSIBILITY—DISCRETION.

Trial judge acted within the bounds of his discretion when he held defendant's statements admissible; he was not required, under the record, to find that the police used delay as a tool to further their interrogations and he could have reasonably accepted the police testimony that defendant was repeatedly warned of his constitutional rights before being questioned; defendant had an opportunity to consult with a lawyer and the most damaging of his alleged statements was not the product of a police interrogation.

8. CRIMINAL LAW—MAGISTRATE—THANKSGIVING DAY.

Police should have acted promptly in bringing defendant before a magistrate and the fact that defendant was arrested on Thanksgiving Day was, in itself, no excuse for delay.

9. CRIMINAL LAW—APPEAL AND ERROR—ADMISSIONS—SEARCHES AND SEIZURES—WEAPONS.

There was no error on the part of a trial judge, under a United States Supreme Court decision that it was error not to allow a defendant a chance to show that his admissions were induced by being confronted with illegally seized evidence, where defendant's trial counsel did not ask the judge to determine if a confrontation with an illegally seized weapon had "induced" defendant to make his statement.

OPINION CONCURRING IN PART

WILLIAMS and M. S. COLEMAN, JJ.

10. SEARCHES AND SEIZURES—SUPREME COURT—SEARCH WARRANT—CONSTITUTIONAL LAW—FOURTH AMENDMENT—PRIVACY, RIGHT OF.

*Michigan Supreme Court must do all that is appropriate to persuade law enforcement officers to make every reasonable effort to employ search warrants in order to safeguard our constitutional right of privacy; that is the purpose and interest of the Fourth Amendment (US Const, Am IV).*

11. SEARCHES AND SEIZURES—CONSTITUTIONAL LAW—FOURTH AMENDMENT—ARREST—AUTOMOBILES—THANKSGIVING DAY—HOMICIDE—MURDER—MAGISTRATES—INFORMANT—WEAPONS—EXIGENT CIRCUMSTANCE—REASONABLENESS.

*Police acted within the bounds of the Fourth Amendment in making a warrantless search of defendant's car trunk after his arrest at his apartment in the early morning of Thanksgiving*

*Day where a crime of violence, murder, and an unlocated gunman said to be dangerous were involved, the police learned of the identity and whereabouts of the alleged murderer between 1 a.m. and 2 a.m. Thanksgiving morning, a day when no magistrate was available, an informer told the police a pistol was either in defendant's bedroom or in the trunk of his car and the informer described the car, the informer described the handgun which he had seen in the alleged murderer's possession before the murder, the police were informed that the alleged murderer had a gun and would resist arrest, and the police were concerned that the murder weapon not be destroyed; where there is an opportunity to destroy evidence that is an exigent circumstance; the sum of the circumstances—the general atmosphere—support the reasonableness of the search (US Const, Am IV).*

See headnotes 6, 7, and 9.

12. SEARCHES AND SEIZURES—REASONABLENESS—CONSTITUTIONAL LAW —FOURTH AMENDMENT.

*The Fourth Amendment protects the public against unreasonable search and seizure and the ultimate test is whether officers' actions under all the circumstances surrounding a search were reasonable; that was the test in 1964 and that is the test today (US Const, Am IV).*

13. SEARCHES AND SEIZURES—PROBABLE CAUSE—REASONABLENESS— POLICE—WEAPONS—INFORMANT—AUTOMOBILES—ARREST.

*Police had probable cause to believe that a murder weapon was in the trunk of a defendant's car where a police informant, upon his personal experience and knowledge, gave police a detailed story implicating the defendant, and the story was corroborated in detail by information the police already possessed; therefore, common sense and the Michigan Supreme Court's duty to pay appropriate deference to a determination of probable cause by the trial court compels the conclusion that the police had adequate cause to rely upon the information of the informant and the resultant search was reasonable.*

Appeal from Court of Appeals, Division 1, Levin, P. J., and R. B. Burns and J. H. Gillis, JJ., affirming Recorder's Court of Detroit, John A. Ricca, J. Submitted October 3, 1973. (No. 7 October Term 1973, Docket No. 54,222.) Decided September 6, 1974. Certiorari denied by the United States Supreme Court January 27, 1975.

James White was convicted of first-degree murder. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Reversed in part, affirmed in part, and remanded for new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Robert A. Reuther,* Assistant Prosecuting Attorney, for the people.

*State Appellate Defender Office* (by *Michael Moran),* for defendant on appeal.

SWAINSON, J. A DSR bus driver named Lucian Fryling was fatally wounded during the night of November 18, 1964, at LaSalle Boulevard and Webb in the City of Detroit. Two eyewitnesses saw a man hurrying away from the bus after the shooting but they were not able to see the man's face.

One week later, on November 25, 1964, the police received information from a Joe Smith which led them to seek Dan Johnson, the informer and principal witness in this case. When Johnson learned that the police were looking for him, he reported to the precinct station. After being interviewed by the detectives in charge of the investigation, Johnson made a statement at approximately 12:30 a.m. on November 26 (Thanksgiving Day), 1964.

At the trial Johnson testified that he and appellant had gone to the scene where the killing occurred on four or five occasions to watch the buses and to plan the robbery of a bus driver. On the afternoon of November 18, 1964, the day of the shooting, they had discussed robbing a driver. The

meeting took place in appellant's car and a third person, Bill Smith,[1] was present. Johnson claimed he did not see appellant again that day. Johnson identified a gun found in the trunk of appellant's automobile shortly after he was arrested as the gun he had seen in appellant's bedroom one month before the killing, and said that appellant sometimes kept the gun in the trunk of his automobile. Both Johnson and the police testified that Johnson had told the police on the morning of November 26 everything he was then relating on the stand.

Acting on the information supplied by Johnson and without a warrant the police immediately went to appellant's apartment arriving at 2:15 a.m., November 26. The police officers knocked on the door. When appellant asked who it was, one of them replied that it was Jimmy Edwards. Appellant opened the door a crack and the police pushed their way into his apartment and arrested him.

After appellant was under their control, the police searched the apartment but did not find a handgun. The police then took appellant's keys and searched his car, which was parked on the street in front of his apartment house. A handgun was discovered in the car's trunk and was seized by the police.

Appellant was taken to police headquarters sometime before 4 a.m. on the morning of the 26th. He was not taken before a judicial officer for arraignment until 2 p.m. on the afternoon of the 27th. In the interim defendant was questioned several times and confronted with the handgun seized from his car and with Johnson's statement implicating appellant in the murder of the DSR bus driver. According to the police, appellant made four unsigned statements during this period.

---

[1] To avoid confusion it should be noted that the record clearly indicates that Joe Smith and Bill Smith are not the same individual.

Appellant made unsuccessful pretrial motions to suppress the admission of the gun and his unsigned statements. He was subsequently tried and convicted of first-degree murder and sentenced to life imprisonment. The Court of Appeals affirmed the conviction in a per curiam opinion dated June 28, 1972, and this Court granted leave to appeal, 388 Mich 780 (1972).[2]

In this appeal we focus on appellant's two primary allegations of error.

1. Was the warrantless search of appellant's car, which was parked on the street in front of the apartment in which appellant was arrested, made in violation of the state and/or Federal constitutional rights to be free from unreasonable civil search and seizure?

2. Did the delay in appellant's arraignment and the nature of the interrogation process render appellant's statements inadmissible at trial?

I

Whenever the police intrude into a sphere of protected privacy without the prior authorization of a warrant issued by a neutral judicial officer, their conduct is subject to careful scrutiny by the courts. To sustain the validity of a warrantless search the burden rests on the people to demonstrate that the police acted in a reasonable manner, based on probable cause and in response to an exigent circumstance bringing the search under one of the specifically established exceptions to the warrant requirement. *Coolidge v New Hampshire,* 403 US 443, 454–455; 91 S Ct 2022; 29 L Ed 2d 564 (1971); *People v Mason,* 22 Mich App 595, 616–617;

_____

[2] A detailed examination of the prolonged delay between trial and appellate consideration of this case is attached to this opinion.

178 NW2d 181 (1970). If the people fail to meet this burden it is the duty of our courts to suppress the admission into evidence of any fruits of the unwarranted search. *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961).

The first step we must take in reviewing the search of appellant's parked automobile and the resulting seizure of the handgun is to determine if the warrantless search arguably fits within one of the exceptions to the warrant requirement. The people argue that the search was proper under what is generally described as the "automobile exception" and it is to the consideration of this exception that we now turn.[3]

The perimeters of the automobile exception have not been definitively established by the United States Supreme Court or by our state's courts. From the early leading case of *Carroll v United States,* 267 US 132; 45 S Ct 280; 69 L Ed 543 (1925) to more recent cases such as *Chambers v Maroney,* 399 US 42; 90 S Ct 1975; 26 L Ed 2d 419 (1970) and *Coolidge v New Hampshire,* 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971), the

---

[3] The only other exception that could possibly justify the search would be the exception for search incident to a valid arrest. Even assuming for the moment that appellant's arrest was valid the law extant in 1964 did not authorize the search of a vehicle parked outside of a person's home when the arrest was accomplished inside of the home. *Compare, Harris v United States,* 331 US 145; 67 S Ct 1098; 91 L Ed 1399 (1947) *and United States v Rabinowitz,* 339 US 56; 70 S Ct 430; 94 L Ed 653 (1950) *with Coolidge v New Hampshire, supra* at 403 US 443, 455–457.

The most factually relevant Michigan case existing at the time of the present search and seizure, *People v Harper,* 365 Mich 494; 113 NW2d 808 (1962), upholds the warrantless search of an automobile on the basis of the reasonableness of the police conduct and the presence of probable cause to search. The Court declined to uphold the search as simply incident to an arrest. *Id.* at 365 Mich 494, 501. Likewise, in *People v Williams,* 383 Mich 549; 177 NW2d 151 (1970), the Court upheld a search of an automobile shortly after defendant's arrest on the basis of probable cause to search and the reasonableness of the search.

United States Supreme Court has resolved each case narrowly on its own facts based on the interrelated concepts of reasonableness and probable cause. Each new situation thus requires the courts to reflect on the rationale underlying the exception and to adopt the teaching of the prior cases to the facts of the case at bar. *Cf. Cady v Dombrowski,* 413 US 433, 439; 93 S Ct 2523, 2527; 37 L Ed 2d 706, 713 (1973).

In *Carroll v United States, supra,* the Supreme Court initially recognized that there were situations in which a warrantless search of an automobile would not violate the Fourth Amendment warrant requirement. Appellant Carroll challenged the authority of Federal agents to stop and search his automobile for the presence of illegal liquor under the National Prohibition Act. The Court considered both the primary goal of the act —to seize contraband liquor rather than to prosecute violations—and the fact that the agents had probable cause to believe that illegal liquor was being transported in Carroll's moving vehicle. In this limited context the Court stated:

"We have made a somewhat extended reference to * * * show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed * * * as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect to which a proper official warrant readily may be obtained, and a search of a * * * automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." 267 US 132, 153.

The *Carroll* Court certainly did not see itself as eliminating the warrant requirement simply because the object to be searched was a mobile

vehicle. It emphasized that: "In cases where the securing of a warrant is reasonably practical, it must be used * * * ". 267 US 132, 156.

Again in 1949 the Court reviewed a situation involving the transportation of liquor contrary to law and upheld the search of defendant Brinegar's automobile after a highway stop on probable cause. *Brinegar v United States,* 338 US 160; 69 S Ct 1302; 93 L Ed 1879 (1949). In the course of resolving the case before it, the Court repeated the narrow scope of the holding in *Carroll.*

"The *Carroll* decision held that, under the Fourth Amendment, a valid search of a vehicle moving on a public highway may be had without a warrant, but only if probable cause for the search exists." 338 US 160, 164.

The Supreme Court first examined the warrant-less search of a parked automobile in *Preston v United States,* 376 US 364; 84 S Ct 881; 11 L Ed 2d 777 (1964). In *Preston* the facts reveal that the police received a complaint at 3 a.m. that three unidentified men were acting suspiciously and had been sitting in a parked car in a business district since 10 p.m. The police investigated the complaint and questioned the occupants of the car. The police then arrested the three men for vagrancy and had the automobile removed to a police garage. Later, they searched the car at the police garage and seized two loaded revolvers and other evidence that was used against Preston at his trial on charges of conspiracy to rob a federally insured bank.

Mr. Justice Black writing for the Court found the search of the automobile at the police garage to be unreasonable. At the time the occupants were arrested the police did not search incident to

arrest nor did they have probable cause to search the vehicle itself. After the car was in police custody, there was no danger of its removal and therefore no circumstances making a warrantless search reasonable. Broadly interpreting the prior automobile exception cases, Justice Black wrote:

"Our cases make it clear that searches of motorcars must meet the test of reasonableness under the Fourth Amendment before the evidence obtained as a result of such searches is admissible." 376 US 364, 366.

See also, *Cooper v California,* 386 US 58, 59–60; 87 S Ct 788; 17 L Ed 2d 730 (1967); *Dyke v Taylor Implement Manufacturing Co,* 391 US 216; 88 S Ct 1472; 20 L Ed 2d 538 (1968).

Then, in a case that at first appears to be departure from past precedent, the Court in *Chambers v Maroney, supra,* upheld the validity of warrantless search of an automobile taken into police custody after its occupants were stopped, and arrested on robbery charges. The Court speaking through Justice White, however, did not perceive the holding in *Chambers* as stating a different rule of law than that found in the prior automobile exception cases. In *Chambers* the police had the requisite probable cause to search the automobile for weapons at the time that it was stopped and its occupants arrested. Justice White then argued that since there was originally probable cause to search, the police in essence did not intrude into an area of protected privacy in any greater degree by searching the car when it arrived at the station house than they would have by immobilizing it until a warrant could be obtained.

The *Chambers* Court was, in fact, very mindful of the past cases. In reaching its result it recognized that there was not an "automobile excep-

tion" per se but rather an exception that allowed for warrantless searches of moving vehicles based on probable cause.

"In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution. As a general rule, it has also required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made. Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search. *Carroll, · supra,* holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible." 399 US 42, 51.[4]

The most recent automobile exception case factually relevant to appellant White's appeal is *Coolidge v New Hampshire, supra.* Although decided by the Court in 1971, *Coolidge* reviewed police

---

[4] Insight into the limits of the automobile exception may also be found in the later dissenting opinion of Justice Brennan in *Cady v Dombrowski,* 413 US 433, 451:

"But the search of the Thunderbird plainly cannot be sustained under the 'automobile exception,' for our prior decisions make it clear that where, as in this case, there is no reasonable likelihood that the automobile would or could be moved, the 'automobile exception' is simply irrelevant."

*See also, Cardwell v Lewis,* 417 US 583, 597–598, 94 S Ct 2464; 41 L Ed 2d 325 (1974) (Stewart, J., dissenting):

"[T]he *Carroll* doctrine simply recognizes the obvious—that a *moving* automobile on the open road presents a situation 'where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' *Carroll, supra,* at 153. See also *Almeida-Sanchez v United States,* 413 U.S. 266, 269 [93 S Ct 2535; 37 L Ed 2d 596 (1973)]. Where there is no reasonable likelihood that the automobile would or could be moved, the *Carroll* doctrine is simply inapplicable. See, *e.g., Coolidge, supra; Preston v United States,* 376 U.S. 364."

conduct taking place in 1964 and 1965. In terms of
the dates involved and the character of the search
performed, *Coolidge* bears a great similarity to the
present case.

The essential facts in *Coolidge* indicate that the
police went to speak to Coolidge at his home on
January 28, 1964, in the course of investigating a
murder that had been committed earlier that
month. Coolidge spoke to the police and accompa-
nied them to take a lie detector test after which he
was not arrested. The police continued their inves-
tigation and on February 19, 1964, returned to
Coolidge's home and arrested him on the murder
charge. At the same time the police seized Cool-
idge's automobile parked in his driveway and
towed it to the station house where it was
searched without a valid warrant.[5] Vacuum sweep-
ings from the interior of the car were seized and
later admitted into evidence over objection. Cool-
idge was thereafter convicted of the murder.

In examining this search the Court[6] found the
automobile exception inapplicable. "Here there
was probable cause, but no exigent circumstances
justified the police in proceeding without a war-
rant". 403 US 443, 464. The facts in *Coolidge*
placed the seizure outside of the reasonable limits
for warrantless searches.

"The word 'automobile' is not a talisman in whose
presence the Fourth Amendment fades away and disap-
pears. And surely there is nothing in this case to invoke

---

[5] The police had obtained a warrant to search but the Court held
the warrant invalid since it was issued by the state attorney general
rather than a neutral magistrate. 403 US 443, 449–453.

[6] The Court spoke through a plurality opinion authored by Justice
Stewart. Justices Douglas, Brennan and Marshall joined in the opin-
ion of Justice Stewart on the automobile exception issue, part II-B of
the opinion. Justice Harlan also concurred with the above Justices in
part II-D of *Coolidge* that found no exigent circumstances present to
justify a warrantless seizure of the automobile.

the meaning and purpose of the rule of *Carroll v United States*—no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile. In short, by no possible stretch of the legal imagination can this be made into a case where 'it is not practicable to secure a warrant,' ". 403 US 443, 461–462.

Following the instruction of these United States Supreme Court precedents, we have serious doubts that the people have sustained their initial burden of demonstrating that the search here in issue fits within the perimeters of the automobile exception to the warrant requirement. The appellant's automobile was parked and unoccupied when the police arrived with an ample number of officers to allow the automobile to be guarded while a warrant was sought. The one circumstance, in our analysis, that might arguably support the reasonableness of the warrantless search was the police suspicion that a weapon was located in the automobile; but a legal basis for the proposition that the suspected presence of a gun alone proves an exigent circumstance is derived only from the dicta in *Coolidge.* The presence of a weapon did not alter the Supreme Court's analysis in either *Preston v United States, supra,* or *Dyke v Taylor Implement Manufacturing Co, supra.* Furthermore, even this *Coolidge* dicta may be read to indicate that the presence of a weapon is only one factor in creating, and not the sum total, of an exigent circumstance. See, for example, *Cady v Dombrowski, supra.*

Based then on the case law and the basic requirement of search and seizure law, we are inclined at this point to hold that the warrantless

search and seizure of appellant's automobile was unreasonable, and therefore not within the automobile exception. In our opinion, however, it is not necessary to test our decision on this basis alone. "The reasonableness of any search or seizure must be determined as of the time of the search or seizure. In the determination of reasonableness, consideration may be given to the information possessed by the police officer." *People v Tisi,* 384 Mich 214, 219; 180 NW2d 801 (1970). In the present case the nature of the information on which the police acted also leads us to conclude that the warrantless search was unreasonable.

The police had not focused on appellant as a suspect in the homicide until after they had questioned Dan Johnson. Then, acting solely on the information supplied by Johnson, the police arrested appellant and searched his apartment and car and seized the handgun. From the record we learn that the police first sought out Dan Johnson on November 25th after a Joe Smith had reportedly given the police information leading them to Johnson. After Johnson learned the police were looking for him, he voluntarily reported to the station house. The police interviewed Johnson at the station house who, according to his own trial testimony, met an initial physical description given to the police by one of the witnesses at the scene of the shooting.[7] Then, early in the morning

---

[7] The record does not clearly indicate the precise reason that the police questioned Johnson—whether they considered him a suspect or merely a lead to further information. The people did not produce Joe Smith nor did they indicate the substance of the information regarding Johnson that Joe Smith gave to the police. The record does indicate, however, that Johnson did meet part of the vague description (6 feet tall, 170 pounds) given by one of the witnesses to the police shortly after the shooting.

Since the people carry the burden of proving probable cause for the police actions, we in this case, must accept the inference from the record that is most favorable to appellant. We, of course, do not

of November 26th, Johnson made a statement indicating that although he was not a witness to the shooting, he had reason to believe that appellant was probably the person responsible for the homicide.

The record, however, reveals no prior contact between the police officers and Johnson that would have allowed them to assess his reliability. Neither is there any indication that the police officers had available or knew of sufficient facts to corroborate the details of Johnson's statement prior to their arrest and search of appellant. All we can gather from this record is that the police first acted on the information by arresting and searching appellant and thereafter obtained a material witness warrant against Johnson under which he was detained until he testified against appellant at trial.[8]

Under the law extant at the time of the search we find that the police did not have a sufficient basis to credit Johnson's statement as reliable. The present facts form a marked contrast to the information held sufficient to justify a warrantless search in *Draper v United States,* 358 US 307; 79 S Ct 329; 3 L Ed 2d 327 (1959). In *Draper* the police acted on information from an informer who had previously provided them with reliable and

express any belief or suspicion that Dan Johnson was in fact involved in the shooting of the DSR bus driver. We look only to determine if the police could use his statement without corroboration as their sole basis for a warrantless search of appellant's automobile.

[8] We note that Johnson did not fit into the category of either a police officer, victim or uninvolved eyewitness that would allow the police, without more, to credit his reliability. *McCreary v Sigler,* 406 F2d 1264, 1269 (CA 8, 1969) *cert den,* 395 US 984; 89 S Ct 2149; 23 L Ed 2d 773 (1969); *People v Lewis,* 240 Cal App 2d 546, 550; 49 Cal Rptr 579 (1966); 37 Mo L Rev 538, 541 (1972). Thus, the people must be able to point to some evidence in the record that indicates that the police had reason to believe that Johnson was providing them with reliable information.

accurate information of criminal activity and arrested Draper with heroin in his possession. Even then, however, Draper was not arrested until several aspects of the informer's statement were visually verified. The police were not required under the holding in *Draper* to verify the fact that Draper possessed heroin prior to the arrest but they were required to be reasonably certain of the truth of the informer's statement before they acted. "[W]ith every other bit of [the informant's] information being thus personally verified, [the narcotics agent] had 'reasonable grounds' to believe that the remaining unverified bit of [the informant's] information—that Draper would have the heroin with him—was likewise true." 358 US 307, 313. Accord, *Whiteley v Warden,* 401 US 560; 91 S Ct 1031; 28 L Ed 2d 306 (1971); *People v Tisi,* 384 Mich 214, 219; 180 NW2d 801 (1970).[9]

Johnson's statement could have been used lawfully as an investigative tool and as a "lead" to interview appellant White. The police also could have attempted to corroborate its details prior to the arrest and search and presented their information to a judicial officer for his determination as to whether a warrant should issue. The police, however, did none of these things. Rather, they proceeded to conduct a warrantless search.

The judicial preference for searches conducted under the authority of a search warrant should be expressed not only in terms of the narrowly drawn exceptions to the warrant requirement but also in terms of a more stringent standard of review applied to all aspects of warrantless searches. The

[9] *Compare* also *People v Harper,* 365 Mich 494; 113 NW2d 808 (1962) where this Court found sufficient probable cause to search defendant's car trunk after defendant stated to the police that a quantity of marijuana was stored there.

courts thereby encourage police officers to seek a warrant before acting.

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." (Footnote omitted.) *Johnson v United States,* 333 US 10, 13–14; 68 S Ct 367; 92 L Ed 436 (1948). See also, *Jones v United States,* 362 US 257, 271; 80 S Ct 725; 4 L Ed 2d 697 (1960); *Whiteley v Warden,* 401 US 560, 566; 91 S Ct 1031; 28 L Ed 2d 306 (1971).

In this case we conclude that the police proceeded to conduct a warrantless search in a situation that did not present an exigent circumstance and on the basis of questionably reliable information. The decision of the trial court denying appellant's motion to surpress was erroneous.

The search and seizure violated the protection of the Fourth and Fourteenth Amendments and Const 1963, art 1, § 11. The introduction of the gun as evidence should have been suppressed.

## II

The second issue we must review is appellant's contention that the trial judge erred by failing to suppress certain admissions made to the police after arrest but before arraignment. Factually, the record reveals that the following events occurred between the time of appellant's arrest on November 26 and his arraignment on November 27:

*November 26, 2:30 a.m.*—Appellant arrested and taken to police headquarters.

*4 a.m.* —Appellant was questioned at police headquarters Homicide Bureau by Detectives Eifrid and Rohn. The police claim that appellant was advised of his constitutional rights; appellant states that no warnings were given him at this time.

Appellant was confronted with the handgun seized and, according to the police, made a statement, never signed, accounting for his activities on the evening of November 18, 1964. Appellant also stated that he purchased the seized handgun on November 24, from Bill Smith and had placed it in his car trunk where it remained until seized by the police. This first interrogation ended at about 5 a.m.

*7:30 a.m.* —Appellant was again questioned by Detectives Eifrid and Rohn. Appellant admitted being informed of his constitutional rights. He was then confronted with a ballistics report linking the seized gun to the homicide and with Johnson's statement. Appellant, according to the police, now disclaimed his 4 a.m. statement and said he wanted to make a new statement. This statement, never signed, related that appellant was originally trying to protect Bill Smith, who had admitted the shooting to him. Appellant said he purchased the gun from Smith only after Smith assured him that it had not been used as a murder weapon.

*8:30 a.m.* —Appellant was placed in a cell block at police headquarters.

*12 noon* —The police claim that appellant was fed for the first time. Appellant maintains he was not fed until 3 p.m.

*4 p.m.* —Appellant was interro-

gated by officers from the Holdup Squad concerning an unrelated crime.

*7:30 p.m.* —Appellant was interrogated by Detective Eifrid. According to the detective's testimony, appellant was read in full Dan Johnson's statement relating how Johnson and appellant on several occasions had watched coaches with an intent to rob the drivers but had never done so. Eifrid testified that after hearing the statement appellant "stated that it was true, except that Dan Johnson was trying to place too much blame on him [appellant]."

*8 p.m.* —Appellant consulted with an attorney.

*November 27, 11:40 a.m.*—Appellant being concerned that he had not as yet been taken to court asked a turnkey if he could see someone related to his case. Detective Rohn responded to talk to appellant. Appellant stated that this interview was limited to determining when he was going to court and if the police had located Bill Smith. In contrast, Detective Rohn testified that when he entered the interview room, appellant "stood up, tears started to come down his cheeks. He turned and faced the wall and he made the remarks, 'I didn't mean it, he lunged at me and the gun went off.' " Detective Rohn testified that appellant then quickly regained his composure and stated that he was referring to Bill Smith and not to himself.

*2 p.m.* —Defendant was arraigned in court on a charge of first-degree murder.

In this pre-*Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966) situation, we first examine the admissibility of appellant's statements under the Michigan statutory requirements governing the arrest-arraignment process.

The statutes governing the arrest-arraignment process provide that after a defendant has been arrested on felony charges he shall be taken before a magistrate for arraignment "without unnecessary delay." MCLA 764.13, 764.26; MSA 28.871(1), 28.885. These sections, while straightforward in their command to the police, have not been interpreted by this Court or require the exclusion of every admission or confession obtained during a period of unreasonable delay. Only when the delay has been employed as a tool to extract a statement has an exclusionary rule been imposed under these sections. *People v Hamilton,* 359 Mich 410; 102 NW2d 738 (1960); *People v Harper,* 365 Mich 494; 113 NW2d 808 (1962); *People v Farmer,* 380 Mich 198; 156 NW2d 504 (1968).

In the present case the trial judge acted within the bounds of his discretion when he held appellant's statements admissible. The police, in our opinion, should have acted promptly in bringing appellant before a magistrate. The fact that November 26 was Thanksgiving Day was, in itself, no excuse for delay. *People v Hamilton,* 359 Mich 410, 417; 102 NW2d 738 (1960). Even assuming, however, that the delay was unnecessarily long, we cannot say that the trial judge was, under the present record, required to find that the police used the delay as a tool to further their interrogations.

The trial judge could have reasonably accepted the police testimony that appellant was repeatedly warned of his constitutional rights before being questioned. Appellant also had an opportunity to consult with a lawyer. Moreover, the most damaging of appellant's alleged statements, that made on November 27th, was not the product of a police interrogation. Appellant requested the November

27th interview with the police officers and, according to police testimony, volunteered his statement as soon as the detective arrived.

We are also unable to accept appellant's contention that the interrogations were of a coercive nature in violation of his constitutional rights. We are mindful that the people carry the burden of proving voluntariness. *People v Zeigler,* 358 Mich 355, 364; 100 NW2d 456 (1960). Our independent review of the record, however, again indicates that the trial judge reached a decision that was reasonable under the facts of this case.

Likewise, we find appellant's citation to *Fahy v Connecticut,* 375 US 85; 84 S Ct 229; 11 L Ed 2d 171 (1963) unpersuasive. In *Fahy* the Supreme Court held that it was error to not allow Fahy "a chance to show that his admissions were induced by being confronted with the illegally seized evidence." 375 US 85, 91. In the present case appellant's trial counsel argued both the illegality of the seizure of the gun and the inadmissibility of appellant's statements. Counsel, however, did not ask the court to determine if the confrontation with the illegally seized weapon had "induced" appellant to make his statements. Therefore, we find no error under *Fahy* on the part of the trial judge.[10]

The Court of Appeals is reversed in part and affirmed in part. This case is remanded for a new trial.

T. M. KAVANAGH, C. J., and T. G. KAVANAGH, J., concurred with SWAINSON, J.

---

[10] Appellant, of course, may move to have his statements suppressed under *Fahy v Connecticut,* as part of the normal procedures incident to the new trial that we find is required under Part I of today's opinion. *Cf. People v Kennedy,* 384 Mich 339; 183 NW2d 297 (1971).

## *APPENDIX*

This case has taken ten years to reach this Court on original appeal. We cannot avoid our duty to comment upon the negligent and cavalier manner in which this case has proceeded to final appellate consideration. During these ten years Mr. White has remained in prison when, as we hold today, he was entitled to a new trial. The people also have surely been prejudiced by this delay. It will undoubtedly be difficult to find witnesses and prepare for a new trial concerning events that occurred in 1964. See, *People v Thomas,* 390 Mich 93, 95; 210 NW2d 776 (1973).

These proceedings have taken every conceivable turn. Appellant's arrest and trial took place in a relatively normal period of time from November 1964 to April 1965. The appellate process began in April 1965 with the appointment of Willis F. Ward as counsel. Mr. Ward subsequently was appointed to the Michigan Public Service Commission (MPSC). Commissioners are prohibited from practicing law in addition to their position. Mr. Ward requested attorney Clayton L. Davis, Jr. to inform the Recorder's Court of Ward's inability to pursue the appeal. Mr. Davis finally wrote in September 1966 (1-1/2 years later); and requested to be appointed substitute appellate counsel.[1] Over the next three years Mr. Davis failed to proceed with any speed and demonstrated a lack of diligence in pursuing the matter. In 1967 he sent appellant one letter reporting work on the case was in progress. Appellant contacted Mr. Davis several

[1] Mr. Ward retained responsibility for proceeding with appellant's appeal until Mr. Davis was formally appointed substitute appellate counsel. Subsequently, Mr. Ward was assessed $100 court costs by the Court of Appeals for failure to meet the time limits required to preserve appellant's appeal as of right.

times requesting action. When these efforts proved
fruitless, appellant wrote the Supreme Court Ad-
ministrator to enlist his aid in obtaining effective
assistance of counsel. The inquiry of the Adminis-
trator motivated Davis to "promise" to file an
application for delayed motion for a new trial in
May, 1968. The motion was finally filed in January
1969. The motion was opposed by the prosecutor's
office and denied in May 1969 by the recorder's
court. Action on the case then rested another nine
months, until February 1970 when Davis was dis-
missed as counsel under the direction of the Su-
preme Court Administrator.

Mr. Joseph Freed was appointed new appellate
counsel and work began again on appellant's ap-
peal. Mr. Carl Ziemba then became associated
with the appeal. The record indicates Mr. Freed
handled much of the early proceedings, and Mr.
Ziemba the later proceedings.

The administrative morass in which appellant
was entangled tripped on its own feet, however,
with the extra appointment of Mr. M. Hector
Cisneros as counsel. Mr. Cisneros promptly with-
drew when informed of the appointment of Mr.
Freed. Through most of 1970 Freed battled to
prepare the case, experiencing amongst other hur-
dles, difficulties in obtaining trial transcripts. The
matter was finally on its way to consideration by
the Court of Appeals in late 1970. Then in Decem-
ber 1970 the prosecutor obtained the first of many
time extensions which put the matter over into
1971. Leave for delayed application to appeal was
granted by the Court of Appeals March 23, 1971, a
long 6-1/2 years after appellant White was first
incarcerated.

There were several prosecution delays in filing
briefs through the summer of '71. The case was

scheduled for hearing for the Fall. On October 11, 1971, *People v White* was finally heard by the Court of Appeals. Eight months later, on June 28, 1972, the Court of Appeals issued its opinion affirming the conviction. The case was immediately appealed to the Supreme Court. In September, 1972, it was necessary for this Court to remand the case to the recorder's court for a determination of indigency. Indigency was found and on December 5, 1972, the State Appellate Defender, Mr. White's fifth counsel, was assigned the case.

The case moved slowly through the Supreme Court proceedings in 1973. Appellant was granted two extensions of time to file his brief in March 1973. Notice of hearing was given August 6, 1973 and the appeal finally argued and submitted October 3, 1973. This case has been under consideration since that time.

WILLIAMS and M. S. COLEMAN, JJ. *(to affirm).* Justice SWAINSON has written a perceptive opinion which graphically demonstrates the difficulty of grappling with warrantless automobile search and seizure questions under the Fourth Amendment. With Justice SWAINSON, we are persuaded that this Court must do all that is appropriate to persuade law enforcement officers to make every reasonable effort to employ search warrants in order to safeguard our constitutional right of privacy. We are convinced that is the purpose and interest of the Fourth Amendment:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

However, on the facts in the instant case, we hold that the police acted within the bounds of the Fourth Amendment with respect to their search of appellant's car. We agree with Justice SWAINSON on the second issue.

## I —FACTS

At approximately 8 p.m. on the evening of November 18, 1964, a DSR bus driver was slain. Moments after the fatal shots two eyewitnesses saw a man hurry from the bus in which the slain bus driver lay. Although the witnesses were unable to see the man's face, nevertheless they retained and later related to the police a general description of the fleeing man.

Approximately a week later, one Dan Johnson, upon learning that the police were looking for him in connection with this crime voluntarily appeared at a precinct station. He informed the police that he had reason to believe that the appellant, James White, was responsible for the death of the bus driver. He recounted that he had been at the scene of the crime with the defendant, James White, four or five times between 7 and 9 p.m. on evenings preceding the crime. Their purpose for these visits was to plan a robbery of a bus driver. Johnson further informed the police that earlier on the night in question he had been with defendant. At that time defendant asked Johnson what he was doing around 7 p.m. because he (James White) was going to get a bus. This meeting took place in defendant's car. A third person, Bill Smith, was present. Johnson also informed the police that he had seen a gun in defendant's bedroom and that defendant kept a gun such as the one described as the murder weapon in either a bedroom drawer or in the trunk of his automo-

bile "under some rags." Acting upon this information, received sometime between 1 and 2 a.m., the police arrested White at his apartment around 2:15 a.m. Thanksgiving Day. The police asked White for his car keys and, upon receiving them, searched the trunk of his car parked on the street in front of the apartment. There, "under some rags", the police found the murder weapon, the suppression of which is the subject matter of this opinion.

## II —*COOLIDGE; PRESTON; CADY*—AUTO SEARCHES

Justice Swainson relies heavily on *Coolidge v New Hampshire,* 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971). However, *Coolidge* specifically *excepts* hypothetical facts which more than the facts in *Coolidge* itself relate directly to the instant case. The *Coolidge* Court said:

"Even assuming, *arguendo,* that *the police might have searched the Pontiac in the driveway when they arrested Coolidge in the house, Preston v United States,* 376 U.S. 364 [84 S Ct 881; 11 L Ed 2d 777 (1964)], makes plain they could not legally seize the car, remove it, and search it at their leisure without a warrant." (Emphasis added.) 403 US 443, 457.

The *Coolidge* hypothetical facts differ from *White* only in that in *Coolidge* the car was in the driveway and in *White* across the street, the difference between suburban and urban living.

Moreover, in *White* there was a reason for search that does not appear in *Coolidge,* namely that the police had probable cause to suspect the murder weapon was in the car. In *Coolidge,* the Court said "[t]he objects [vacuum sweepings of microscopic particles to show presence of gun pow-

der and murder victim] that the police are as-
sumed to have had probable cause to search for in
the car were neither stolen, nor contraband nor
dangerous." 403 US 443, 460. That is probably why
the Court also said "[h]ere there was *probable
cause,* but no *exigent* circumstances justified the
police in proceeding without a warrant." (Empha-
sis added.) 403 US 443, 464.

This brings us to *Preston v United States,* 376
US 364; 84 S Ct 881; 11 L Ed 2d 777 (1964) where
the Court speaks more positively even than in
*Coolidge* about the reserved exception. In *Preston,*
the Court said:

"Here, we may assume, as the Government urges,
that, either because the arrests were valid or *because
the police had probable cause to think the car stolen,*
the police had the *right to search the car when they
first came on the scene.* But this does not decide the
reasonableness of a search at a later time and at
another place." (Emphasis added.) 376 US 364, 367–368.

The *Preston* hypothetical is closer to *White* even
than the *Coolidge* hypothetical is, because of two
factors: first, the *Preston* hypothetical speaks
firmly of "probable cause" and second the *Preston*
hypothetical speaks of the police conducting the
search "when they first came on the scene". This
reference is to "exigent circumstances" because,
while the car was temporarily parked, the car was
occupied and could have been driven away just as
surely as a car stopped on the highway. See *Car-
roll v United States,* 267 US 132; 45 S Ct 280; 69 L
Ed 543 (1925). Both factors are present in *White* —
the *Coolidge* search was made only after a lengthy
investigation of over a week.

It would be stretching *Coolidge* to say on the
basis of the hypothetical exception that it was
precedent for upholding the search in *White.* How-

ever, on the other hand, it would be inaccurate to say that *Coolidge* controls *White* against the validity of the search.[1]

Likewise, *Preston* on the basis of its hypothetical cannot be said to be four square precedent for the reasonableness of the search in *White,* because the defendants were in a parked car at the time of the search of the car, whereas White was in his apartment room across the street. However, *Preston* cannot be said to be precedent against the validity of the *White* search. In fact, *Preston* in this hypothetical seems to extend the probable cause rule from moving cars to parked cars, at least if the defendants are in them, although already arrested. In *White,* of course, the defendant was arrested and in custody but his wife and Bill Smith were not.

This brings us to *Cady v Dombrowski,* 413 US 433; 93 S Ct 2523; 37 L Ed 2d 706 (1973). *Cady* justified a search where the defendant had been arrested for an automobile accident while drunk and taken to the police station and his wrecked car had been hauled to a private garage. Two or three hours after the arrest the police searched the car without a warrant to look for the defendant Chicago police officer's service revolver. The Court concluded its consideration of this part of its opinion in these words:

"Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold the search was not 'unreasonable' within the meaning of the Fourth and Fourteenth Amendments." 413 US 433, 448.

In reaching this conclusion the Court said that the

---

[1] We do not believe Justice Swainson says it does.

police had exercised a form of custody, and that search was standard police procedure, in order to bring the case closer to *Harris v United States,* 390 US 234; 88 S Ct 992; 19 L Ed 2d 1067 (1968) and *Cooper v California,* 386 US 58; 87 S Ct 788; 17 L Ed 2d 730 (1967). 413 US 433, 442, 443, 445. However, it is obvious that the danger of the weapon falling in the wrong hands is the Court's primary concern. For example, it says:

"In *Harris* the justification for the initial intrusion into the vehicle was to safeguard the owner's property, and in *Cooper* it was to guarantee the safety of the custodians. Here the justification, while different, was as immediate and constitutionally reasonable as those in *Harris* and *Cooper:* concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." 413 US 433, 447.

What lessons do we learn from *Coolidge, Preston* and *Cady?*

(1) The Fourth Amendment protects the public against *unreasonable* search and seizure. The ultimate test is whether the officers' actions under all the circumstances surrounding the search were reasonable. That was the test in 1964 and that is the test today.

(2) Neither *Coolidge* nor *Preston* is precedent against the reasonableness of the search in *White;*

(3) *Coolidge* and *Preston* are support but not four square precedent for *White;*

(4) *Cady* is strong support but again not four square precedent for *White;*

(5) *Coolidge* articulates the underlying principle patently or latently present in all the pertinent

cases,[2] namely the Siamese twins of reasonable warrantless search: "probable cause" and "exigent circumstances." The Court said:

"Here there was *probable cause,* but no *exigent circumstances* justified the police in proceeding without a warrant." (Emphasis added.) 403 US 443, 464.

The Court in *Coolidge* emphasized tests for "exigent circumstances" in finding there were none in *Coolidge.* The Court said:

"In this case, the police had known for some time of the probable role of the Pontiac car in the crime. Coolidge was aware that he was a suspect in the Mason murder, but he had been extremely cooperative throughout the investigation, and there was no indication that he meant to flee. He had already had ample opportunity to destroy any evidence he thought incriminating. There is no suggestion that, on the night in question, the car was being used for any illegal purpose, and it was regularly parked in the driveway of his house. The opportunity for search was thus hardly 'fleeting.' The objects that the police are assumed to have had probable cause to search for in the car were neither stolen nor contraband nor dangerous." 403 US 443, 460.

(6) Where there is "probable cause" and the search is contemporaneous and nearby (defendants in parked car—*Preston;* defendant in house, car in driveway—*Coolidge)* the search may be constitutional;[3]

---

[2] Excluded from this discussion are the so-called custody cases: *Cooper v California,* 386 US 58; 87 S Ct 788; 17 L Ed 2d 730 (1967), and *Chambers v Maroney,* 399 US 42; 90 S Ct 1975; 26 L Ed 2d 419 (1970).

[3] *See Dyke v Taylor Implement Manufacturing Co,* 391 US 216, 221; 88 S Ct 1472; 20 L Ed 2d 538 (1968):

"Automobiles, because of their mobility, may be searched without a warrant upon facts not justifying a warrantless search of a residence or office. *Brinegar v United States,* 338 U.S. 160 [69 S Ct 1302; 93 L Ed 1879] (1949); *Carroll v United States,* 267 U.S. 132 [45 S Ct 280; 69

(7) Where there was "probable cause" to believe the defendant's weapon might be in the car and there was natural concern that the weapon might fall into the wrong hands (an exigent circumstance) search in a car sent by the police to a private garage several miles from the police station where the defendant had been under arrest and in custody for more than two hours was held reasonable. The car was said to be in partial custody of the police and the weapon search was said to be standard police procedure in such a case. *Cady*.[4]

## III —GENERAL LEGAL OBSERVATIONS

While *Coolidge, Preston* and *Cady* are closest to precedent for *White,* a few more general observations on the background law are in order.

To begin with, it is fair to report that *Chimel v California,* 395 US 752, 755; 89 S Ct 2034; 23 L Ed

L Ed 543; 39 ALR 790] (1925). The cases so holding have, however, always insisted that the officers conducting the search have 'reasonable or probable cause' to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search."

And *see, Chambers v Maroney,* 399 US 42, 49, 51; 90 S Ct 1975; 26 L Ed 2d 419 (1970):

" 'The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for a belief that the contents of the automobile offend against the law.' " (Quoting from *Carroll v United States, supra.)*

\* \* \*

"Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search."

[4] Whatever the validity today, under Supreme Court cases, of the Michigan cases, *People v Harper,* 365 Mich 494; 113 NW2d 808 (1962) and *People v Williams,* 383 Mich 549; 177 NW2d 151 (1970), decided prior to *Cady,* they are distinguishable from *White,* first, in that the arresting officers did not, when they came upon the scene in the former cases know what they were looking for in the car searched, and, secondly, because they did not have the "exigent circumstances" present that the instant case presents.

2d 685 (1969), one of the more recent of the leading cases in the field, said in passing:

"The decisions of this Court bearing upon that question [warrantless search incident to arrest] have been far from consistent * * * ." 395 US 752, 755.

Furthermore, an earlier case, *Harris v United States*, 331 US 145, 150; 67 S Ct 1098; 91 L Ed 1399 (1947), made the following remark:

"The test of reasonableness cannot be stated in rigid and absolute terms. 'Each case is to be decided on its own facts and circumstances.' *Go-Bart Importing Company v United States*, 282 U.S. 344, 357 [51 S Ct 153; 75 L Ed 374] (1931)."

To return to *Chimel,* the Court there said:

"Thus although '[t]he recurring question of the reasonableness of searches' depend upon 'the facts and circumstances—the total atmosphere of the case' *id.,*[5] at 63, 66 (opinion of the Court), those facts and circumstances must be viewed in the light of established Fourth Amendment principles." 395 US 752, 765.

Finally *Chambers v Maroney,* 399 US 42, 48, made a point which underlies many of the cases:

"In terms of the circumstances justifying a warrantless search, the Court has long distinguished between an automobile and a home or office."

See also *Dyke v Taylor Implement Manufacturing Co,* 391 US 216, 221; 88 S Ct 1472; 20 L Ed 2d 538 (1968); *Brinegar v United States,* 338 US 160, 176–177; 69 S Ct 1302; 93 L Ed 1879 (1949); *Carroll v United States,* 267 US 132, 151.

In passing, the article, *Warrantless Searches*

---

[5] Referring to *United States v Rabinowitz,* 339 US 56; 70 S Ct 430; 94 L Ed 653 (1950).

*and Seizures of Automobiles,* 87 Harv L Rev 835 (1974), presents a fairly workable rule of thumb with which to proceed:

"In black letter law, the basic rule for warrantless automobile searches and seizures is easy to state: a car may be searched or seized without warrant if there are both exigent circumstances and probable cause to believe that the car will yield contraband or evidence useful for prosecution of crime." *Id,* 835.

## IV —APPLYING *COOLIDGE, PRESTON & CADY* TO *WHITE*

### A. —*Critical Factors in White*

In the light of these lessons from *Coolidge, Preston* and *Cady,* plus other salient case observations,[6] the critical factors in *White* are:

1) *White* involves a crime of violence, murder, and an unlocated gunman said to be dangerous.

2) The police learned of the identity and whereabouts of the alleged murderer between 1 a.m. and 2 a.m. Thanksgiving morning, a day when no magistrate was available.

3) The informer "told us [the police] the pistol was either in his bedroom [drawer] or in the trunk of his car" "under some rags." The car was described as a "56 Ford * * * [y]ellow two door, had a big dent in the back of the trunk" with an outside padlock.

4) The informer described the handgun which he had seen in the alleged murderer's possession before the murder. Incidentally he identified it at trial and a ballistics expert tied the murder bullet to that weapon.

5) The police were informed that the alleged

---

[6] *See Warrantless Searches and Seizures of Automobiles,* 87 Harv L Rev 835 (1974).

murderer had a gun and "was going to resist arrest if any policemen came to take him".

6) The police were concerned that the murder weapon not be destroyed.

### B. —Application of Law to White

Checking our own criteria and having in mind the "atmosphere" test and the twin requirements of exigency and probable cause, we begin by distinguishing the facts in *White* from those in *Coolidge* where the investigation had lasted over a week with the cooperation of the defendant, with no indication of flight on his part and where there had been "ample opportunity to destroy any evidence he thought incriminating." As the Court remarked in *Coolidge* there was no exigent imperative.

*White* on the other hand reeks with exigent imperatives.[7] To begin with, there is a murderer loose who is alleged to be dangerous, the police learn of his whereabouts between 1 and 2 a.m. Thanksgiving morning. Upon arrest at about 2:15 a.m. the same morning and search of his apartment the alleged murder weapon is not found but the information received is that the gun if not in the bedroom is in the trunk of an aptly described car which should be at that hour, and was, parked nearby across the street. While the defendant is under arrest his wife and Bill Smith are not and there is always the possibility that one of them could remove the car or the gun. In addition there exists the possibility that the weapon will fall into the wrong hands. Because it is Thanksgiving Day

---

[7] We do not suggest exigent circumstances would not be established by factors not as numerous or persuasive as these. We merely emphasize that in this case the circumstances are overwhelmingly supportive of such a finding.

and before daylight the possibility of finding a magistrate to secure a warrant is illusory.[8]

While certain of the accessory facts in *Cady,* such as semi-police custody of the car (but see *Preston)* and standard procedure, are not present in *White,* the facts in *White* certainly argue as strongly for reasonableness, especially in light of *Cady's* real rationale for intrusion into the vehicle: "[C]oncern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." 413 US 433, 447.

Additionally, the negative pregnant in *Coolidge* states that there were "no exigent circumstances" (403 US 443, 464) where, among other things, there had been "ample opportunity to destroy any evidence he [the defendant] thought incriminating." (403 US 443, 460.) Putting it the other way around, where there is an opportunity to destroy evidence that is an exigent circumstance. The defendant's wife, who was with defendant at the time of arrest and witnessed the police search in the apartment for evidence might very well have "destroyed [the] evidence" or removed the gun from the trunk of defendant's car, had the police not done so.

So much for the posture of the case relative to

---

[8] The inability of the police to get a magistrate to consider issuing a warrant before sunup or at any time during Thanksgiving Day, we believe goes to "exigency". Support for this view is found in *Carroll v United States, supra. Coolidge* endorses this *Carroll* point of view at 403 US 443, 459–460, as follows:

"The underlying rationale of *Carroll* and of all the cases that have followed it is that there is

" 'a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where *it is not practicable to secure a warrant* because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' 267 U. S., at 153. (Emphasis supplied [by *Coolidge].)"*

the "exigency" required to justify a warrantless search.

As to the officers' "probable cause", the informer, who identified himself as having known the defendant for some time, as having plotted similar bus thefts and as having been with the defendant shortly before the crime, described defendant in a manner to conform with police information about him. Furthermore, the informer not only told the police where to find the defendant but that the alleged murder weapon would be in one of two places, the latter being the car trunk, where it was found. The *White* case for "probable cause" seems at least as strong as *Cady*. See also *Coolidge* and *Preston*.

The sum of the circumstances—the general atmosphere—support the reasonableness of the search, especially in view of *Cady* and the reserved exceptions in *Coolidge* and *Preston*.

## V —INFORMER CREDIBILITY

Justice SWAINSON goes in back of the search to the reliability of Dan Johnson upon whose information the police found probable cause to arrest defendant. His opinion notes that the record reveals no prior contact between the police officers and Johnson until he walked voluntarily into the police station.

However, once there Johnson informed the police that he and the appellant had gone to the scene of the crime on several occasions to watch buses and plan a robbery of a bus driver. The latest discussion as to a robbery took place on the day of the crime. Johnson related that defendant owned a handgun which he had seen and which at times defendant kept in his automobile. The handgun described by Johnson was the type used in the slaying of the bus driver.

Johnson's information was based upon his personal experience and knowledge. This is sufficient to satisfy the requirement that Johnson acquire his information in a trustworthy fashion. Moreover, his detailed story, corroborated in detail by the information the police already possessed, was, in this case, sufficient basis to establish his credibility.[9] See *People v Tisi,* 384 Mich 214; 180 NW2d 801 (1970).

Here the police had probable cause to believe that the murder weapon was in the trunk of the car. Common sense and our duty to pay appropriate deference to a determination of probable cause by the trial court compel us to conclude that the police had adequate cause to rely upon the information of Dan Johnson and that the resultant search was indeed reasonable.

## VI —APPELLANT'S STATEMENTS ADMISSIBLE

We concur in Justice SWAINSON's analysis on this point.

## VII —CONCLUSION

We would affirm.

LEVIN and J. W. FITZGERALD, JJ., did not sit in this case.

---

[9] Justice SWAINSON points to *Draper v United States,* 358 US 307; 79 S Ct 329; 3 L Ed 2d 327 (1959) as stark contrast to the instant case. However, the Court in *Draper* noted:

" 'In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Brinegar v United States, supra,* at 175. Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. *Carroll v United States,* 267 U.S. 132, 162." (Footnote omitted.) 358 US 307, 313.