PEOPLE v ESTERS

Docket No. 64265. Argued June 8, 1982 (Calendar No. 1).—Decided December 23, 1982.

Ben Esters was convicted by a jury in the Genesee Circuit Court, Philip C. Elliott, J., of armed robbery and possession of a firearm during the commission of a felony. The Court of Appeals, Cavanagh and Cynar, JJ. (Kelly, P.J., dissenting), affirmed in an unpublished opinion per curiam. The defendant appeals, contending three things: that a pistol admitted in evidence was found in an illegal search of his automobile, that a statement made by him after he had asked for a lawyer should not have been used to impeach him, and that he was denied the effective assistance of counsel.

The judgments below are affirmed by an equal division of the Court.

Justice Coleman, joined by Chief Justice Fitzgerald, wrote to affirm:

In the circumstances of this case, none of the issues raised by the defendant warrants reversal of his conviction.

1. The police officers who responded to the report of an armed robbery were given the description and license number of the robber's car. A few minutes later they found the car parked in the driveway of a house near the place of the robbery, and wet footprints leading from the car into the house. When they arrested the defendant in the house, he was unarmed, and they had probable cause to believe that the missing pistol or other evidence of the crime would be in the car.

2. Given probable cause for the search, the next question is whether the automobile exception to the requirement for a search warrant applies. The Supreme Court of the United

REFERENCES FOR POINTS IN HEADNOTES

[1-5] 68 Am Jur 2d, Searches and Seizures §§ 43, 45, 99.

Validity, under federal constitution, of warrantless search of automobile—Supreme Court cases. 26 L Ed 2d 893.

[6, 8-10] 21A Am Jur 2d, Criminal Law §§ 746, 747, 972 et seq.

81 Am Jur 2d, Witnesses §§ 67, 527, 596, 598, 600, 603.

[7] 68 Am Jur 2d, Searches and Seizures § 44.

States has held that a warrant to search an automobile is unnecessary when there is probable cause for the search and there are exigent circumstances. For constitutional purposes, there is no difference between seizing and holding the car before presenting the probable cause issue to a magistrate and carrying out an immediate search without a warrant. In this case, the police officers had reason to believe that the defendant had a female accomplice who was still at large. The missing pistol and missing accomplice provided exigent circumstances, so that the seizure was appropriate and therefore the search was proper.

3. A statement made by an accused after he has asked for counsel but before counsel has been provided is not admissible in the case in chief, unless the accused himself initiated further communications with the police. However, such a statement, if voluntary, may be used to impeach the defendant who testifies. Therefore, no error was committed in permitting the use of the defendant's prior voluntary statement for impeachment.

4. The defendant was not denied the effective assistance of counsel by his retained lawyer. He claimed that he was denied a substantial alibi defense by the failure of his lawyer to call certain alibi witnesses at the trial and to request an instruction on alibi. The findings and conclusions of the trial judge at a separate hearing on a motion for new trial convincingly demonstrate that the witnesses could not have assisted in establishing the alibi defense. They would have testified that the defendant was with them some time earlier but, of necessity, because he was arrested pretending ·sleep in a house only seven minutes after the robbery, he had to contend that at the time of the robbery he was at home asleep, alone.

Justice Levin, joined by Justices Kavanagh and Ryan, concurred in part. They all agreed that the statements made by Esters after he had requested counsel, while inadmissible in the prosecution's case in chief, were, as a matter of United States constitutional law, admissible for impeachment purposes, and Justice Ryan would affirm the conviction. However, Justices Kavanagh and Levin would, on Michigan constitutional grounds, reverse the conviction and join in the conclusions in Justice Williams' opinion on that issue.

Justice Williams, dissenting on the use of the defendant's statement for impeachment, wrote that the voluntariness of the statement is not enough; a defendant who requests counsel while in custody may not be found to have subsequently waived his right to counsel unless his waiver was made intelligently and knowingly. Unless such a waiver is established, statements

of the defendant taken after he has asserted his right to counsel may not be used to impeach his testimony at trial.

1. The Supreme Court of the United States has held that the prohibitions of the Fifth and Fourteenth Amendments against compelled self-incrimination mandate that custodial interrogation be preceded by advice that the defendant has the right to remain silent and the right to the presence of an attorney during interrogation. That Court has also indicated that the right to counsel is to be accorded greater protection than the right to remain silent. An accused's request for counsel is a significant event, more significant even than a complete failure to apprise the defendant of his rights. Invocation of the right to counsel should prevent the government from availing itself of the use of statements by the defendant obtained contrary to his constitutional right, even for impeachment purposes.

2. In this case, a sufficient finding of a valid waiver of the defendant's right to counsel was not made. Allowing the use of the statements for impeachment was error.

OPINION BY COLEMAN, J.

1. SEARCHES AND SEIZURES — AUTOMOBILES — CONTRABAND — PROBABLE CAUSE.

*When a police officer stops a car to search for contraband, the legality of the search is determined by whether the officer had probable cause to believe that contraband was in the car.*

2. SEARCHES AND SEIZURES — AUTOMOBILES — PROBABLE CAUSE.

*Police officers had probable cause to search an automobile belonging to a defendant charged with armed robbery for the pistol used in the robbery or other evidence of the crime where they had been given a description and license number of the car used in the robbery, had found it a few minutes after the robbery parked in the driveway of a house near the place that was robbed, and had arrested the unarmed defendant inside the house.*

3. SEARCHES AND SEIZURES — AUTOMOBILES — WITHOUT A WARRANT.

*An immediate search of an automobile without a warrant is permissible where there is probable cause to search the automobile and exigent circumstances make obtaining a search warrant impractical (US Const, Am IV).*

4. SEARCHES AND SEIZURES — AUTOMOBILES — WITHOUT A WARRANT.

*Given probable cause to search an automobile, either seizing and holding the automobile before presenting the probable cause issue to a magistrate or carrying out an immediate search*

*without a warrant is reasonable under the Fourth Amendment (US Const, Am IV).*

5. Searches and Seizures — Automobiles — Without a Warrant — Exigent Circumstances.

*A search of a defendant's car without a warrant was permissible under the Fourth Amendment where there was probable cause to believe that a pistol used in an armed robbery or other evidence of the crime was in the car, and where the car retained its mobility and police officers had reason to believe that a female accomplice of the defendant was still at large; the missing pistol and missing accomplice provided exigent circumstances (US Const, Am IV).*

6. Criminal Law — Defendant Testifying — Impeachment — Voluntary Statements.

*A voluntary statement by a defendant which is not admissible in the case in chief because it was made during interrogation initiated by a police officer after the defendant had requested a lawyer may be used to impeach the defendant's testimony at his trial.*

Opinion by Levin, J.

7. Searches and Seizures — Without a Warrant — Exigent Circumstances.

*The police may make a nonconsensual entry into a home without a warrant to effect an arrest where both the entry and the arrest are justified by exigent circumstances; such circumstances likewise justify the search of an automobile without a warrant.*

8. Criminal Law — Voluntary Statements — Admissibility — Impeachment — Constitutional Law.

*Statements made by a defendant after he requested counsel but before counsel was furnished are not admissible in the prosecution's case in chief, and are inadmissible even for impeachment purposes as a matter of Michigan constitutional law.*

Opinion by Williams, J.

9. Criminal Law — Voluntary Statements — Admissibility — Impeachment.

*A defendant who requests counsel while in custody may not be found to have subsequently waived his right to counsel unless his waiver was made intelligently and knowingly; unless such waiver is established, statements of the defendant made after*

*he has asserted his right to counsel may not be used to impeach his testimony at trial.*

10. CRIMINAL LAW — VOLUNTARY STATEMENTS — ADMISSIBILITY — IMPEACHMENT.

*The right to counsel is to be accorded greater protection under the Constitution of the United States than the right to remain silent; invocation of the right to counsel should prevent the government from availing itself of the use of statements by the defendant obtained contrary to his right to counsel, even for impeachment purposes.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Robert E. Weiss,* Prosecuting Attorney, and *Donald A. Kuebler,* Chief, Appellate Division, for the people.

*Robert L. Segar* for the defendant.

COLEMAN, J. Defendant was convicted of armed robbery and the possession of a firearm during the commission of a felony. He presents three issues in seeking to have his convictions reversed. First, he argues that a pistol admitted into evidence was the result of an unlawful warrantless search of his automobile, which was parked in his driveway. Second, he contends that it was reversible error to admit into evidence for impeachment purposes the defendant's statement of noninvolvement made to a police officer newly assigned to the case subsequent to defendant's request for an attorney. Third, he argues that he was denied the effective assistance of counsel.

We find that none of these contentions under the circumstances of this case warrant the reversal of his conviction and therefore affirm the judgments of the Court of Appeals and the trial court.

I

In the afternoon of December 24, 1977, the Flint Police Department was notified that an armed robbery had just occurred at Pro-Clean, a laundry and dry cleaning establishment in Flint. The police, upon arriving at the scene, were informed that the robbery was perpetrated by a masked black male armed with a small silver pistol and that a woman may also have been a participant. The assistant manager of the store gave the police a piece of paper containing a description of a car, a white over blue Buick, and a license number. This piece of paper had been given to the assistant manager by a customer, who had told him that this was the car in which the robber had escaped.

The police then drove through the neighborhood in the general area of the cleaners. Within a few minutes, they saw a car parked in a driveway which matched the vehicle description and bore the license plate number that they had been given. There were wet tire tracks leading up to the vehicle from the street and wet footprints leading from the driveway into the adjoining house. The officers knocked on the door of the house and, receiving no response, forced the door and entered. They found the defendant, dressed and with his shoes on, lying on a bed. After arresting him, they proceeded to search the house for the woman. In an open closet next to the bedroom where defendant was found, one of the officers saw a purse with currency protruding from the top and it was seized. The police officers did not find the woman and did not find a gun on defendant's person or in the house.

One of the police officers then went outside and

searched the car, which was unlocked. He testified that he was both looking for the gun, because he believed a female accomplice was still at large, and routinely inventorying the car prior to its being towed away and impounded. As he reached to open the glovebox, he observed a silver pistol hanging from under and somewhat behind the dashboard just to the right of the steering wheel. He took the gun and several other items prior to impounding the car.

The defendant was taken to the Flint police station. At approximately 3 p.m. of the same afternoon, he was advised of his *Miranda* rights and he indicated that he did not want to make a statement but that he wanted an attorney. No further questions were asked of him at that time. Two days later, on Monday, December 26, 1977, an officer who that day had been assigned to the case advised the defendant of his *Miranda* rights. The officer testified that the defendant answered affirmatively when asked if he wanted to waive his right to have an attorney present and to discuss the matter. The officer obtained a statement of noninvolvement from the defendant. The defendant testified that he made the statement as a result of the police officer telling him that he was going to be sentenced to life imprisonment and that it would be better if he talked.

Prior to trial, defendant moved to suppress both the gun obtained from the car and the statement he gave on December 26, 1977. Regarding defendant's statement, the trial judge believed the police officer and disbelieved the defendant. He ruled that the statement was admissible because the defendant knowingly and voluntarily waived his *Miranda* rights. He also found the gun admissible

on two alternative grounds. First, he found that exigent circumstances existed which justified the search of the automobile. Second, he found that the gun was obtained pursuant to a reasonable inventory search.

At defendant's trial for armed robbery and the possession of a firearm during the commission of a felony, four employees of Pro-Clean testified. They related that a man with a ski mask came into the store about 1:30 p.m., December 24, 1977, brandished a small silver pistol, and demanded money. One of the four employees testified that a woman was with him. The man was given currency and coin rolls which the employees estimated as totaling between $100 and $200. One of the employees testified that the robber was given two rolls of coins. Because of the mask, none of the employees were able to identify the person.

A 15-year-old boy and his mother also took the stand at trial. The boy testified that he had entered Pro-Clean and was standing at the counter when the man with the mask and gun·entered. After the man told everyone not to move, the boy ran out the door to the car in which his mother was waiting. He told his mother that a robbery was taking place inside. They sat in their car, which was near one of the doors of Pro-Clean. The man with the mask came running out of that door, pulled off his mask and ran across an open lot to Kermit Street. The boy and his mother identified the defendant as being the man they saw leaving the shop and as the man they saw driving towards them as he turned from Kermit onto Mott Street.

The boy testified that he and his mother were driving away from Pro-Clean when he saw the

defendant driving a blue and white Buick. He wrote the license number on a piece of paper, with a description of the car and then returned to Pro-Clean. He gave the piece of paper with the license number and description to a man at Pro-Clean.

The police testified at trial concerning their arrest of the defendant. The gun and the money in the purse seized by the police were also admitted into evidence. The assistant manager of the store, one of the four employees at Pro-Clean at the time of the robbery, testified that the gun looked like the one used in the robbery. The money obtained from the purse amounted to $107, including two coin rolls.

The defendant testified at trial that he had been in the laundry earlier in the day with a Mr. Thompson, but that he was at Earl Farmer's at the time during which the robbery had occurred. He testified that he had just gone from Mr. Farmer's to his mother's house about 1:30 or 1:35 p.m. and had then gone to bed for a nap. He did not reside at his mother's home, but because she was away, he was taking care of it. He was awakened by the police and arrested.

In rebuttal, the police officer to whom the defendant made a statement on December 26, 1977 testified. He stated that the defendant had told him that he had gone to his mother's home after leaving Robert Thompson. According to defendant's statement to the officer, while the defendant was driving into the driveway, a man named James approached the defendant. The defendant said that James came into the house and told the defendant he wanted to borrow the car to go get two ladies. The defendant thought that that was a

good idea, so he allowed James to take the car.
James came back in a little while, but without any
ladies. He wanted the defendant to take him for a
ride but the defendant was tired and wanted to
take a nap. James left and the defendant said he
went to sleep.

The jury convicted the defendant of armed rob-
bery and possession of a firearm during the com-
mission of a felony. Defendant appealed to the
Court of Appeals challenging the admission into
evidence of the gun and of the statement he made
to the police officer after his request for counsel.
He also alleged that he was denied effective assis-
tance of counsel. The Court of Appeals addressed
only the claim of ineffective assistance of counsel,
stating that it was the only issue meriting discus-
sion.

The Court stated:

"We concede that the question here presented * * *
is a close one. We determine that the performance of
defense counsel in this case, while certainly wanting in
some respects, did not fall to the level condemned in
*Beasley v United States,* 491 F2d 687 (CA 6, 1974). We
conclude that defense counsel did perform as well as a
lawyer with ordinary training and skill in the criminal
law and that he did conscientiously protect his client's
interests, undeflected by conflicting considerations. We
also find that any mistake that was made by defense
counsel was not one but for which defendant would
have had a reasonable likelihood of acquittal."

Judge Kelly dissented, concluding that a remand
for an evidentiary hearing on ineffective assistance
of counsel should be ordered.

Appellate counsel was appointed for the defen-
dant, pursuant to an order of this Court, for the

purpose of filing an application for leave to appeal. Defendant's appellate counsel, with the consent of the prosecutor, requested an evidentiary hearing in the trial court after filing a delayed motion for new trial. The hearing was held but the motion for new trial was denied by the trial judge. Defendant then filed his application for leave to appeal, which this Court granted on November 25, 1981.

## II

We initially note an issue that we do not address. Appellant for the first time on this appeal challenges the lawfulness of his arrest. He relies on *Payton v New York,* 445 US 573; 100 S Ct 1371; 63 L Ed 2d 639 (1980), in which the Supreme Court of the United States held that absent exigent circumstances, the police may not make a nonconsensual and warrantless entry into a private dwelling to make an arrest. Appellant asserts that the police officers could have obtained a warrant and, if necessary, watched the house pending its issuance. Because they did not obtain a warrant, appellant contends the arrest was unlawful and, as a consequence, the gun and statement obtained from the defendant thereafter should have been suppressed.

The appellee gives three reasons why reversal should not be predicated on this ground. First, the issue was not raised in either the trial court or the Court of Appeals. Second, appellee argues *Payton v New York* should not be applied retroactively to an arrest that occurred approximately three years prior to the *Payton* decision. Third, the arrest was justified by the exigent circumstances that existed in this case.

We conclude that because the issue was not raised below, it is not properly before this Court.

III

Defendant argues that it was reversible error for the trial court to deny his motion to suppress from evidence the gun found in his automobile. He contends that the search was unconstitutional under the Fourth Amendment of the Constitution of the United States because the car was parked on private property with no reasonable chance for destruction or disappearance during the period of time necessary to apply for a warrant. A guard could have been posted to prevent the loss of any evidence until a warrant was issued. Hence, appellant concludes that this case does not come within the automobile exception to the warrant requirement. Appellant also contends that this case is distinguishable from *South Dakota v Opperman,* 428 US 364; 96 S Ct 3092; 49 L Ed 2d 1000 (1976), which the trial court alternatively found would justify the present search as an inventory search.

The standards we must apply in evaluating the search in this case are those arising from the Fourth Amendment.[1] In *Cady v Dombrowski,* 413 US 433, 439; 93 S Ct 2523; 37 L Ed 2d 706 (1973), the Supreme Court stated:

"The ultimate standard set forth in the Fourth Amendment is reasonableness. In construing this com-

---

[1] The Fourth Amendment of the Constitution of the United States provides:

"The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

mand, there has been general agreement that 'except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.' * * * One class of cases which constitutes at least a partial exception to this general rule is automobile searches. Although vehicles are 'effects' within the meaning of the Fourth Amendment, 'for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars.' " (Citations omitted.)

This constitutional difference between houses and cars was recognized in *Carroll v United States,* 267 US 132, 153; 45 S Ct 280; 69 L Ed 543 (1925), and explained as follows:

"[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."

The Court in *Carroll* concluded that when a police officer stops a car to search for contraband, the legality of the search is determined by whether the officer had probable cause to believe that contraband was in the car.

In this case there clearly was probable cause for the search. The car in which the gun was found bore the license plate and matched the description given to the police of the car being driven by the perpetrator of the armed robbery. The police, after arresting the unarmed defendant minutes after

the robbery, had probable cause to believe that the missing gun or other evidence of the crime would be in the car. Given probable cause, however, a more difficult question is whether the automobile exception applies, thus allowing the warrantless search.

In *Coolidge v New Hampshire,* 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971), a search of an automobile seized in defendant's driveway was held not to come within the automobile exception to the warrant requirement. The police in *Coolidge* had conducted an investigation over several weeks that linked the defendant to a murder. When enough evidence had been accumulated to justify the arrest of the defendant, the state Attorney General, acting as a justice of the peace, issued an arrest warrant and search warrants for defendant's house and cars. The defendant was arrested at his house. His wife was told that she could not use the cars because they had been impounded. Subsequently, the cars were towed to the police station, where they were later searched.

The Court held that the evidence found in one of the automobiles was improperly admitted at defendant's trial. The warrants that were issued by the state Attorney General were invalid because he was not a neutral and detached magistrate. Absent a valid warrant, there were no exigent circumstances justifying the search of the car. The Court stated: "Since the police knew of the presence of the automobile and planned all along to seize it, there was no 'exigent circumstance' to justify their failure to obtain a warrant." *Coolidge, supra,* 478. In rejecting the "plain view" argument that the car could be seized and searched because it was an instrumentality of the crime and plainly visible at defendant's house, the Court stated:

"[T]he determining factors are advance police knowl-
edge of the existence and location of the evidence,
police intention to seize it, and the ample opportunity
for obtaining a warrant." *Coolidge, supra,* 482.

Although *Coolidge* is similar to the present case
in the fact that the defendant's car when seized
was in the driveway of the home in which he was
arrested, it differs from this case in several impor-
tant particulars. The police in the present case did
not know where they would find the defendant and
they found him at his mother's residence only
minutes after the robbery occurred. Unlike the
officers in *Coolidge,* the police did not come to
defendant's home planning to make an arrest and
planning to search the car that they expected to
find there. They were searching for a car that they
happened to find at a residence. Prior to finding
the automobile in the present case, there was no
opportunity to obtain a warrant. After arresting
the defendant, the police had reason to believe
that a female accomplice was in the area and a
gun was in the car.

Such facts also distinguish this case from *People
v White,* 392 Mich 404; 221 NW2d 357 (1974). In
*White,* the police went to defendant's apartment to
arrest him for a murder that had occurred a week
before. After arresting him, they searched ·the
house for a gun, and not finding it, proceeded to
search his car, where they did find it. No search or
arrest warrants had been obtained, although no
reason appears why they could not have sought
such warrants prior to proceeding to defendant's
apartment. This Court, relying on *Coolidge,* in part
predicated its finding of unreasonability of the
search on the conclusion that the search did not
come within the perimeters of the automobile
exception. This Court also found no probable cause

for the search. The present case differs from *White* in the same respect that it differs from *Coolidge:* the police in the present case had no opportunity to obtain a search warrant prior to the time that the car was found.

Defendant, however, relies on one of the statements in *White* to argue that after the defendant was arrested, the car should have been guarded pending the issuance of a warrant. In *White,* p 417, this Court stated: "The appellant's automobile was parked and unoccupied when the police arrived with an ample number of officers to allow the automobile to be guarded while a warrant was sought." Appellant essentially argues that his automobile could have been seized first and searched later, after a warrant was obtained.

This argument, however, has been rejected by the Supreme Court. In *Chambers v Maroney,* 399 US 42, 50-52; 90 S Ct 1975; 26 L Ed 2d 419 (1970), the Court wrote:

"Neither *Carroll, supra,* nor other cases in this Court require or suggest that in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords. But the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable. Where this is true, as in *Carroll* and the case before us now, if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search.

"In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution. As a general rule, it has also required the

judgment of a magistrate on the probable-cause issue
and the issuance of a warrant before a search is made.
Only in exigent circumstances will the judgment of the
police as to probable cause serve as a sufficient authori-
zation for a search. *Carroll, supra,* holds a search
warrant unnecessary where there is probable cause to
search an automobile stopped on the highway; the car
is movable, the occupants are alerted, and the car's
contents may never be found again if a warrant must
be obtained. Hence an immediate search is constitution-
ally permissible.

"Arguably, because of the preference for a magis-
trate's judgment, only the immobilization of the car
should be permitted until a search warrant is obtained;
arguably, only the 'lesser' intrusion is permissible until
the magistrate authorizes the 'greater'. But which is
the 'greater' and which the 'lesser' intrusion is itself a
debatable question and the answer may depend on a
variety of circumstances. For constitutional purposes,
we see no difference between on the one hand seizing
and holding a car before presenting the probable cause
issue to a magistrate and on the other hand carrying
out an immediate search without a warrant. Given
probable cause to search, either course is reasonable
under the Fourth Amendment."

Thus, the Court upheld the warrantless search of
an automobile at the station house on the grounds
that the search could have been conducted when
the car was stopped, and "there is little to choose
in practical consequences between an immediate
search without a warrant and the car's immobili-
zation until a warrant is obtained". *Chambers,* p
52. See also *United States v Ross,* 456 US 798, 807,
fn 9; 102 S Ct 2157; 72 L Ed 2d 572 (1982).

In this case also "there is little to choose in
practical consequences between an immediate
search without a warrant and the car's immobili-
zation until a warrant is obtained".

We conclude, therefore, that the warrantless

search of appellant's car was permissible under
the Fourth Amendment. There was probable cause
for the search, and absent the seizure, the car
retained its mobility, especially since the police
had reason to believe a female accomplice was still
at large. The missing gun and missing accomplice
provided exigent circumstances.[2] Thus, the seizure
was appropriate, and given the seizure, the search
was warranted under *Chambers, supra.* Addition-
ally, because the robbery had occurred just min-
utes prior to the time the police found the automo-
bile, the police could not have obtained a search
warrant prior to the time the automobile was
found. They were in hot pursuit of the robber. This
fact, plus the obvious fact that the police did not
know they were going to defendant's home to
arrest him and search for evidence, distinguishes
this case from *Coolidge, supra,* and *White, supra.*
Although it is argued that an officer could have
stayed with the car while a warrant was obtained
by another, there were only three officers at the
scene. The problems were acute. We can assume
that backup help may have been available, but the
necessity, if any, for a warrant under these cir-

---

[2] Prior to any criminal trial, many persons have been involved in
the process. Some are lawyers, while others are not. From the police
officer whose concern is to protect the public within the framework of
ever-developing state and federal constitutional guidelines and stat-
utes to the final appellate body to review every link in the connective
chain, individual rights are protected. Sometimes, a flaw in the chain
is difficult to detect or is not ascertainable until an appellate court
rules that it is in fact a flaw. In the meanwhile, law enforcement and
the administration of justice must continue. Interpretation of the
constitutional prohibition against *unreasonable* search and seizure
changes with the times and the courts. Fair trials often are tested
against the standard of perfect trials. That test must be subjective, so
various judges and levels of appellate judges differ as to what is fair,
what is constitutional.

Particularly in cases of hot pursuit and other situations where time
is of the essence and unknown dangers must be considered, quick
action may be reasonable and an appellate overlay of common sense
may be a needed ingredient in decisionmaking.

cumstances is vague, even to experienced counsel and judges. The reasonable actions of the police under these circumstances did not constitute an impermissible invasion of private property or of an individual's protected right to privacy in an automobile identified as having been involved in a robbery just minutes prior to the search. We would not require useless exercises, empty of substance, when there is no discerned legal or practical need. Accordingly, the trial court properly denied defendant's motion to suppress the gun.

Because we find this search proper under the automobile exception to the warrant requirement, there is no need to consider whether the search was a proper routine inventory search prior to towing away the car.

## IV

Appellant also contends that the use for impeachment purposes at trial of statements he made to a police officer who initiated questioning after appellant requested counsel was reversibly erroneous. The defendant had moved to suppress these statements but the trial court denied his motion. Defendant argued that the denial of the motion was an error in light of *Edwards v Arizona,* 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981). In *Edwards,* pp 484-485, the Court held:

"[A]n accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

See, also, *People v Paintman,* 412 Mich 518; 315 NW2d 418 (1982).

However, neither *Edwards* nor *Paintman* considered whether voluntary statements obtained from a defendant in violation of the *Edwards* holding could be used for impeachment purposes. The trial court found defendant's statements to be voluntary. Although the trial court's denial of the motion to suppress the statement did not limit its use to impeachment, at trial the statement was used only for that purpose. The trial court in denying the delayed motion for a new trial found that the *Edwards* decision did not affect the principle that voluntary statements obtained in violation of *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), could be used for impeachment purposes. *Harris v New York,* 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971). *Oregon v Hass,* 420 US 714; 95 S Ct 1215; 43 L Ed 2d 570 (1975).

In *Harris,* the defendant was not advised of his right to appointed counsel. The statements that he thereafter made were conceded by the prosecution to be in violation of *Miranda,* and the prosecution made no effort to use them in its case in chief. The prosecution did, however, seek to use the statements to impeach the defendant's testimony. The Supreme Court agreed that such use of voluntary statements was permissible:

> "*Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards.
>
> *   *   *
>
> "The shield provided by *Miranda* cannot be perverted

into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris,* pp 224, 226.

This Court noted the *Harris* rule for voluntary statements in *People v Reed,* 393 Mich 342; 224 NW2d 867 (1975), but found it inapplicable to the involuntary statements present in that case.

*Harris* is determinative of the instant question. *Edwards* was a ruling on the nature of the *Miranda* rights, particularly addressing the question of how the right to counsel is waived once it is invoked. *Harris* specifically addresses the question involved here, which is whether any use can be made of a voluntary statement obtained in violation of *Miranda.* Regarding this question *Edwards* is silent. Therefore, we conclude that no error was committed by the use of defendant's prior voluntary statement for impeachment purposes. See also *State v Cartwright,* — Mont —; 650 P2d 758 (1982).

## V

Appellant's final contention is that he was denied his right under the Sixth Amendment of the Constitution of the United States to the effective assistance of counsel. *McMann v Richardson,* 397 US 759; 90 S Ct 1441; 25 L Ed 2d 763 (1970). In *People v Garcia,* 398 Mich 250; 247 NW2d 547 (1976), this Court followed *Beasley v United States,* 491 F2d 687 (CA 6, 1974), in rejecting the farce or mockery standard once prevalent as the measure of whether the effective assistance of counsel had been afforded to the defendant. In *Beasley,* p 696, the Sixth Circuit Court of Appeals stated:

"We hold that the assistance of counsel required

under the Sixth Amendment is counsel reasonably
likely to render and rendering reasonably effective
assistance. It is a violation of this standard for defense
counsel to deprive a criminal defendant of a substantial
defense by his own ineffectiveness or incompetence.
* * * Defense counsel must perform at least as well as
a lawyer with ordinary training and skill in the crimi-
nal law and must conscientiously protect his client's
interest, undeflected by conflicting considerations. * * *
Defense counsel must investigate all apparently sub-
stantial defenses available to the defendant and must
assert them in a proper and timely manner." (Citations
omitted.)

The defendant's most important contention re-
garding the ineffective assistance of counsel is that
he was denied a substantial alibi defense. He
claims that his attorney failed to investigate the
defense properly by not speaking to Earl Farmer
and that he failed to present the defense properly
at trial because he called neither Earl Farmer nor
Robert Thompson to testify. Further, he failed to
request an alibi instruction.

The trial judge carefully considered those con-
tentions after conducting an evidentiary hearing.
In his opinion denying defendant's motion for a
new trial, he wrote:

"The testimony of Robert Thompson would not have
helped the defense. He would say that he and the
defendant had gone to the cleaners-laundromat earlier
on the day of the 1:30 robbery. He had not seen the
defendant after 12 or 12:15, over one hour before the
robbery occurred. His testimony would only have shown
that the defendant had been at the place that was later
robbed and would have seen that it was especially busy
and making money.

"Should defense counsel have called Earl Farmer as a
witness? When defendant made a statement to Sgt.
Darby on December 26th, he never mentioned being

with Earl Farmer; rather, he mentioned a 'James' whose last name he did not know. Defense counsel had no recollection of ever being told about Earl Farmer. Since defense counsel knew about Robert Thompson and tried to produce him, but never mentioned Earl Farmer when asked if he would like the names of his witnesses given to the jury on voir dire, I think Mr. Talkow was never told about him; and I disbelieve any contrary statements of the defendant.

"Moreover, Earl Farmer's testimony would not establish an alibi. Mr. Farmer is careful to say that the defendant left him at least 15 minutes before the robbery occurred. The time could have been much longer. Mr. Farmer was later convicted of illegal possession of Demerol and he would not have made a convincing witness. Frankly, I doubt that he ever saw the defendant on the day of the crime.

"The problem with use of Farmer or anyone to establish an alibi is that the police found the defendant pretending sleep in a house, alone, about seven minutes after the robbery. By necessity, the defense had to contend that at the time of the robbery the defendant was home asleep, alone.

"Should defense counsel have asked for an instruction on alibi? Obviously, if the jury believed that the defendant was home asleep at the time of the robbery or that he was anywhere other than the place of the robbery at the time it occurred, or if the jury had a reasonable doubt about that, they would have acquitted him. The jury was properly instructed as to the presumption of innocence, reasonable doubt and that they must find that the defendant committed the crime. An instruction on 'alibi' seems unnecessary in the circumstances of this case."

These findings and conclusions of the trial judge convincingly demonstrate that defendant was not deprived of a substantial alibi defense by defense counsel.

The remaining arguments are without merit.

In concluding that defendant was not denied the

effective assistance by his retained attorney, we note that his attorney did raise the significant issues. An evidentiary hearing on remand addressed the res gestae witness challenges. All have been considered by this Court.

We conclude that neither the trial court nor the Court of Appeals committed reversible error.

We affirm.

FITZGERALD, C.J., concurred with COLEMAN, J.

LEVIN, J.

I

Esters challenges the lawfulness of his arrest relying on *Payton v New York,* 445 US 573; 100 S Ct 1371; 63 L Ed 2d 639 (1980). In *Payton,* the United States Supreme Court held that absent exigent circumstances a police officer cannot make a nonconsensual warrantless entry of a home to effect an arrest. The Court declined to define "exigent circumstances". *Id.,* p 583.

The people present three reasons why *Payton* does not render the arrest of Esters illegal. The first is the failure of Esters to raise the issue in the trial court or in the Court of Appeals. It would not, however, have been possible to raise this issue at those times because this case was tried and then reviewed by the Court of Appeals before the United States Supreme Court decided *Payton.*

The arrest of Esters occurred three years before *Payton* was decided. The people contend that *Payton* should not be retroactively applied. In *United States v Johnson,* 457 US 537; 102 S Ct 2579; 73 L Ed 2d 202, 217-218 (1982), the United States Supreme

Court held that *Payton* applies "to all cases still pending on direct appeal at the time when *Payton* was decided". Johnson's arrest, before *Payton* was decided, did not bar application of *Payton* in *Johnson*.

The people's third contention is that *Payton* does not invalidate the arrest of Esters because there were exigent circumstances. We agree.

An armed masked man and a woman accomplice had robbed a dry-cleaning establishment. As the man left the scene, he took off his mask and was seen by two persons in the parking lot. Shortly thereafter those persons saw him in an automobile. They noted and gave the license number and a description of the automobile and robbers to an employee of the dry-cleaning establishment. The police arrived at the scene within seven minutes of the robbery and were given this information. They immediately began a search of the area and within minutes spotted the automobile a few blocks from the scene of the robbery.

The automobile was parked in the driveway of a house. Wet tire tracks in the driveway indicated that it had been recently driven. The police also saw wet footprints between the automobile and the house.

The police knocked at the door and, receiving no response, forced it open, entered the house, and arrested Esters. Seeking the gun and the accomplice, the police searched the house, but found neither.

These facts constitute exigent circumstances. See *Warden v Hayden,* 387 US 294; 87 S Ct 1642;

18 L Ed 2d 782 (1967). In *Hayden,* an armed robber was followed by two cab drivers as he left the scene of the robbery and entered a house. One driver relayed a description of the robber and his whereabouts to a dispatcher, who in turn relayed the information to the police. The police arrived within minutes and entered the house. The United States Supreme Court held that the police

"acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." 387 US 298-299.

In the instant case, the police were given descriptions of the robbers and of the automobile, and the automobile's license number. The police searched in the vicinity of the robbery and quickly discovered the automobile. The police arrived in hot pursuit knowing that an armed robber and possibly an accomplice had probably entered the house shortly before their arrival. As in *Hayden,* speed was essential in attempting to apprehend the suspects before they could escape.

We would apply *Payton* in this case, but hold that exigent circumstances justified the warrantless entry and arrest.

II

Esters also challenges the warrantless search of

the automobile. The automobile was parked in the driveway of the house in which the police apprehended him. We agree with the lead opinion that there was probable cause for the search, and that the missing gun and missing accomplice were in the instant case exigent circumstances justifying the warrantless search. However, we do not agree that the automobile exception cases, cited in the lead opinion, are applicable.[1]

The warrantless search of Esters' automobile was justified for the same reasons that the arrest and search of the house were justified. The police had been informed that a gun had been used in the commission of the robbery and that the robber had an accomplice. After arresting Esters and searching the house, a short time after the robbery, the police had not uncovered the gun nor found the accomplice. The automobile in the driveway matched the description of the one used in the robbery. Speed was essential in both searches to protect the police, and in apprehending the suspects to prevent their escape. See *Warden v Hayden, supra.* The exigent circumstances justified the warrantless search of the automobile.

### III

We agree with the lead opinion that the statements made by Esters to the police officer after Esters requested counsel, while inadmissible in the prosecution's case in chief, were, as a matter of

---

[1] *Carroll v United States,* 267 US 132; 45 S Ct 280; 69 L Ed 543 (1925), concerned a search of an automobile which was stopped on a highway. *Chambers v Maroney,* 399 US 42; 90 S Ct 1975; 26 L Ed 2d 419 (1970), concerned the validity of a warrantless search at the station house of an automobile which had earlier been stopped on the highway and which could have been legally searched when initially stopped. These cases do not concern the validity of a search of a parked automobile.

United States constitutional law, admissible for impeachment purposes. *Oregon v Hass,* 420 US 714; 95 S Ct 1215; 43 L Ed 2d 570 (1975). A different question would have been presented, however, had the statements been made after Esters retained counsel to represent him in this matter. But see Part V.

IV

We concur in Part V of the lead opinion.

V

Justice RYAN concurs in Parts I through IV of this opinion and would affirm the conviction.

Justices KAVANAGH and LEVIN would, on Michigan constitutional grounds, reverse the conviction and join in the conclusions expressed in Justice WILLIAMS' opinion on the issue dealt with in Part III of this opinion.

WILLIAMS, J. *(for reversal).* In section IV, Justice COLEMAN concludes that the trial court did not err in allowing into evidence at trial defendant's "prior *voluntary* statement for impeachment purposes". It is undisputed that the custodial interrogation of the defendant by the police after he invoked his right to counsel violated the technical holding of *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), which is grounded in the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination. *Edwards v Arizona,* 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981).

The question which remains is whether this Court, after the decision in *Edwards,* should ex-

tend the principle established in *Harris v New York,* 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971), and *Oregon v Hass,* 420 US 714; 95 S Ct 1215; 43 L Ed 2d 570 (1975), where the United States Supreme Court upheld the use of a defendant's prior statement, obtained in violation of *Miranda,* to impeach his trial testimony. Justice COLEMAN applies *Harris* in the instant case. We would not.

In *Miranda,* the Supreme Court held that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination mandated that custodial interrogation be preceded by advice to a defendant that he has the right to remain silent and also the right to the presence of an attorney. In recognizing these substantive constitutional rights, that Court also established the procedures to be used subsequent to the warnings. If a defendant indicates that he wishes to remain silent, the interrogation is to cease. If he requests counsel, the interrogation is to end until an attorney is present. 384 US 474. In short, the *Miranda* Court concretely established the right to have counsel present during custodial interrogation. In addition, the Supreme Court later noted the difference between the procedural safeguards triggered by a request to remain silent and a request for an attorney. See *Michigan v Mosley,* 423 US 96, 104, fn 10; 96 S Ct 321; 46 L Ed 2d 313 (1975). It indicated that greater protection is to be accorded the latter right.

Moreover, the Court in *Edwards* not only reemphasized the importance of the right to counsel during custodial interrogation, but it also stated that "additional safeguards are necessary when the accused asks for counsel". *Edwards, supra,* 484. See, also, *People v Paintman,* 412 Mich 518, 524;

315 NW2d 418 (1982). Thus, the *Edwards* Court held the following:

"[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 US 484.

In *Harris, supra,* the Supreme Court allowed a statement made by a defendant who had not been advised of his right to appointed counsel in violation of *Miranda* to be used for impeachment purposes. Unlike *Harris,* the *Edwards* decision concerned a defendant who had not only been advised of his *Miranda* rights, but who had invoked his right to have counsel present. *Harris* is therefore distinguished. Nor do we believe, like Justice COLEMAN, that *Edwards* is silent on the question of the use of defendant's prior statements for impeachment purposes.

First, the Supreme Court in *Edwards* labeled an accused's request for an attorney a "significant event", more significant even than the complete failure to give the *Miranda* warnings. This crucial invocation of a Fifth Amendment right should prevent the government from availing itself of this constitutional violation even for impeachment purposes.

Second, Justice COLEMAN, like the trial court, says "that no error was committed by the use of defendant's prior *voluntary* statement for im-

peachment purposes". (Emphasis added.) Justice
Coleman has phrased the issue as "whether any
use can be made of a voluntary statement obtained
in violation of *Miranda*". However, in *Edwards,*
the Court stated that:

"*Schneckloth [v Bustamonte,* 412 US 218, 226; 93 S
Ct 2041; 36 L Ed 2d 854 (1973)] itself thus emphasized
that the voluntariness of a consent or an admission on
the one hand, and a knowing and intelligent waiver on
the other, are discrete inquiries. Here, however sound
the conclusion of the state courts as to the voluntari-
ness of Edwards' admission may be, neither the trial
court nor the Arizona Supreme Court undertook to
focus on whether Edwards understood his right to
counsel and intelligently and knowingly relinquished it.
It is thus apparent that the decision below misunder-
stood the requirement for finding a valid waiver of the
right to counsel, once invoked." 451 US 484.

In light of this language, we would refuse to
extend *Harris* in such a way that statements
taken in violation of *Edwards* can be used for
impeachment purposes unless there is a finding of
a "valid waiver of the right to counsel, once in-
voked". 451 US 484. We would thus hold that the
trial court erred in allowing the prior statement of
the defendant, taken in violation of *Miranda,* to be
used for impeachment purposes at trial where in
the instant case there was not a sufficient finding
of a valid waiver of the right to counsel.

Furthermore, we feel that the defendant's rights
may not be diminished merely because the state
fails to respond to defendant's request for counsel,
as it should have done. Once he has asked for
counsel, the defendant has done all that is within
his power to secure this guaranteed right. We
would consider in some future case where the
matter has been properly raised whether the de-

fendant should not be protected against an abuse of authority involving the defendant in a statement that he would not have made had he been properly counseled, as requested. It is our present opinion that a defendant having requested counsel while in custody may not subsequently be found to have waived that right unless it may be found that the defendant made this waiver with the intelligence and knowledge which he would have had, had he obtained the advice of counsel.

Justices KAVANAGH and LEVIN would join in the conclusion expressed in Justice WILLIAMS' opinion on Michigan constitutional grounds.

RILEY, J., took no part in the decision of this case.